THE J. E. OWEN. THE E. H. NICHOLSON. OWEN v. 65,000 BUSHELS OF CORN. SAME v. 49,774 BUSHELS OF RYE.

(District Court, N. D. New York. February 1, 1893.)

DEMURRAGE—LIABILITY OF CONSIGNEE—GRAIN BLOCKADE.

Two vessels laden with grain from Chicago arrived at Buffalo on Friday at 6 P. M., consigned to elevators with New York Central Railroad connections. There were 28 boats ahead of them. The amount of grain in Buffalo awaiting transshipment east was unprecedented, and navigation was about to close. There was no demand that the consignees or their agents should furnish another elevator, and no claim for damages was made until after the grain was unloaded. The consignees were not negligent in failing to procure an elevator before Monday, and it did not clearly appear that during the following week any other elevator could have released the vessels sooner than that to which they were consigned, and certainly none with New York Central connections could have done so. There was no stipulation as to lay days. *Held,* that the consignees were not liable for the damage resulting to the ship owner from a delay of 10 days in unloading.

In Admiralty. Libel for freight and damages, in the nature of demurrage, for the detention of libelant's vessels at the port of Buffalo for 10 days, from November 27 to December 7, 1891. Decree for libelant for freight and interest thereon, but disallowing demurrage.

George Clinton, for libelant.
Charles A. Pooley, for respondents.

COXE, District Judge. The steamer J. E. Owen left Chicago with the schooner E. A. Nicholson in tow November 20, 1891, and arrived at Buffalo Friday, November 27, 1891, at 6 P. M. The Owen carried a cargo of corn, consigned to the order of the shippers under a bill of lading containing the following provisions: "Order of Boyden and Co. Notify McIntyre and Wardwell, New York. Care of G. J. Ross, Agt. N. Y. C. R. R., Buffalo, N. Y." The Nicholson carried a cargo of rye consigned to the order of the shippers under a bill of lading containing the following provisions: "Order Irwin Green & Co. Notify Power, Son and Co., New York. Care S. D. Caldwell at City

elevator, Buffalo, N. Y." Neither bill of lading had any provision for lay days or demurrage. There were 28 boats ahead of the Owen and the Nicholson at the City elevator waiting to be unloaded, and, although nine of these were sent to other elevators, the libelant's boats were not unloaded until December 7th, and 8th—about ten days after their arrival. There was no demand that the consignees or their agents should furnish another elevator, and no claim for damages was made until after the grain was unloaded. The vessels arrived nearly at the close of navigation. There was at the time an unprecedented amount of grain in the harbor of Buffalo waiting for transshipment to the east. The City elevator was working night and day. All the other elevators having railroad connections, were being taxed to their utmost capacity. There was no delay to the boats at the City elevator other than that occasioned by waiting for their turn. There are over 30 elevators at the port of Buffalo, but the evidence is not at all conclusive that the cargoes in question could have been unloaded at any of these after November 29th, which was Sunday. The agent of the vessel owners, whose duty it was to attend to the unloading of the vessels, testifies that during the week beginning with the 30th "there was still a little room;" but whether there was room to receive cargoes aggregating nearly 115,000 bushels does not appear. There is evidence tending to show that on the 28th the cargoes might have been received at the Wells and Wilkinson elevators, but it does not appear that the offer was communicated to the consignees. The Wells and Wilkinson elevators were controlled by a competing railroad, and the cars of the New York Central Railroad were not permitted to load there. The vessels arrived late Friday afternoon, Sunday was a dies non, and it would seem that all the witnesses agree that no negligence can be imputed to the consignees in failing to procure an elevator before Monday. After that day a fair statement of the situation would seem to be that no elevator having connection with the New York Central Railroad could have been obtained, and it is at least doubtful on the proof whether an elevator having any railroad connections could have been had. The grain might, perhaps, have been received at the Watson, Black Diamond and Cyclone elevators, but these were only used for storage purposes and for transferring grain to canal boats. Their use by the consignees would have occasioned great inconvenience and expense. They were wholly unsuited to answer the required needs.

What is the law applicable to this situation?

Demurrage is an extended freight or reward to the vessel in compensation of the earnings she is caused to lose improperly. Strictly speaking, demurrage can only be recovered where it is reserved by the charter party or bill of lading. Where no such express reservation exists the remedy is by an action, in the nature of demurrage, for damages for the wrongful detention. Gage v. Morse, 12 Allen, 410. Every wrongful detention may be considered a demurrage, but in the absence of an express agreement damages can only be recovered upon proof that the delay complained of was due to some fault or negligence on the part of the respondent. The burden of proving this

is upon the libelant. Riley v. Cargo of Iron Pipes, 40 Fed. Rep. 605. If the consignee has a right to demand that the cargo shall be delivered at a particular dock he is not guilty of fault in requiring the libelant's vessel to take her turn with other waiting vessels. Where no lay days are provided for he is not liable for delays accruing without his fault. Cross v. Beard, 26 N. Y. 85; Wordin v. Bemis, 32 Conn. 268; The Glover, 1 Brown, Adm. 166; Clendaniel v. Tuckerman, 17 Barb. 184; Towle v. Kettell, 5 Cush. 18; Weaver v. Walton, 5 Chi. Leg. N. 125; Abb. Shipp. 311–313. Where by reason of any unusual or unexpected occurrence several vessels arrive together at the dock to which they are consigned, the consignee is not obliged to procure other docks, but the vessels must respectively await their turns. Fulton v. Blake, 5 Biss. 371. The consignee under a bill of lading in which no time is stipulated for unloading is not liable for the detention of the ship in the London docks, if she is there unloaded in her turn. He is not responsible for delay occasioned by the crowded state of the docks. Rodgers v. Forresters, 2 Camp. 483; Burmester v. Hodgson, Id. 488. Damages are not recoverable where the vessel was detained near the close of navigation while waiting in accordance with custom to be unloaded in its turn at an elevator, where there was nothing to show that the delay was unreasonable. The only obligation resting on the respondent was to take the grain in the usual and customary way, with reasonable diligence. The M. S. Bacon, 3 Fed. Rep. 344; Coombs v. Nolan, 7 Ben. 301. The consignee is not liable for damages for delay because 17 days elapsed before the cargo was unloaded, where the delay was caused by the vessel awaiting her turn according to the usage of the port. Bellatty v. Curtis, 41 Fed. Rep. 479; The Elida, 31 Fed. Rep. 420; The Mary Riley v. 3,000 Railroad Ties, 38 Fed. Rep. 254.

Applying the law to the facts in hand it is clear that the libelant is not entitled to damages for the detention of her boats. The onus was upon her to prove negligence and she has only succeeded in raising a doubt. The interpretation of the testimony most favorable to the libelant only establishes the proposition that if the consignees had been informed of the exact capacity of the other elevators during the time in question they might possibly have secured the necessary room. This, in no circumstances, is sufficient to establish negligence. The grain was consigned to elevators having New York Central Railroad connections; this was part of the contract; was well known to the libelant's agent and, I am inclined to think, exonerated the consignees from providing another elevator; but assuming that they were required to look elsewhere the proof falls far short of showing that they were guilty of laches in this respect. They certainly were not required to take a floating elevator or receive the grain for storage on an island or in canal boats. They were at least entitled to have their grain go on to its destination, and it could not go otherwise than by rail. I am not satisfied that they could have provided, during the week beginning November 30th, another elevator which could have released the vessels sooner than the City elevator. It is possible that they might have done so, but this possibility is not enough. Certainly the court would be un-

warranted in finding that the libelant has established by a preponderance of evidence that other elevators having railroad connections could have unloaded the vessels sooner than the City elevator. All the witnesses agree that the situation was unprecedented. An immense amount of grain had reached the harbor of Buffalo. Navigation was about to close. Every effort was being made to accommodate this extraordinary congestion. The elevators having railroad connections were being worked night and day. Everywhere there was a blockade of greater or smaller proportions. The energies of those engaged in the work of transferring these cargoes were taxed to the utmost, their time was occupied with the daily routine of this busy period. To hold men so situated responsible for the greatest care and diligence, to charge them with every item of information and knowledge which was only elicited by a protracted judicial investigation, would be to establish a new rule of law for the guidance of consignees. Indeed, after an examination, which was intended to be thorough, I have failed to find a single authority allowing damages in circumstances like those developed in the case at bar. Vessel owners can stipulate for lay days, if they so desire, but if they prefer not to do so they must take the risk of delays occasioned by such phenomenal circumstances as these which occurred at Buffalo in November and December, 1891.

It follows that the libelant is not entitled to damages; but is entitled to recover freight in each action and interest from December 9, 1891, besides costs.